JAMES F. McCABE (CA SBN 104686)
JMcCabe@mofo.com
BEN PATTERSON (CA SBN 268696)
BPatterson@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  415.268.7000
Facsimile:  415.268.7522

WILLIAM V. O'CONNOR (CA SBN 216650)
WOConnor@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, CA92130-2040
Telephone:  858.720.5100
Facsimile:  858.720.5125

RONALD I. RAETHER, JR. (*pro hac vice*)
RRaether@ficlaw.com
DONALD E. BURTON (*pro hac vice*)
DBurton@ficlaw.com
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, S.W.
10 North Ludlow Street
Dayton, Ohio  45402
Telephone:  937.227.3736
Facsimile:  937.227.3717

Attorneys for Defendant
LEXISNEXIS RISK SOLUTIONS INC.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT D. FEINSTEIN, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>LEXISNEXIS RISK SOLUTIONS INC., a Georgia corporation; and DOES 1 through 50, inclusive,<br><br>                    Defendant. | Case No.   14-cv-1635 JAH (NLS)<br><br>PUTATIVE CLASS ACTION<br><br>**DEFENDANT LEXISNEXIS RISK SOLUTIONS INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Judge John A. Houston<br>Courtroom:  Courtroom 13B<br>Date:  May 18, 2015<br>Time:  2:30 p.m. |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION .............................................................................. 1

FACTUAL SETTING .......................................................................... 1

    A.    LNRS's MVR Product ........................................................ 1

        1.    State Reports ............................................................. 1

        2.    LNRS Alternative Reports ....................................... 3

        3.    Choosing Between a State Report and an Alternative Report .................................................................... 3

    B.    Plaintiff's Experience in Indiana ...................................... 4

PLAINTIFF'S CLAIMS ..................................................................... 8

RELEVANT STATUTES ..................................................................... 9

LEGAL STANDARD ........................................................................ 10

ARGUMENT ................................................................................... 10

I.    PLAINTIFF'S CASE IS FOUNDED ON A LEGAL THEORY  THAT THE FEDERAL TRADE COMMISSION ADOPTED IN COMMENTARY WHICH HAS BEEN RESCINDED AND  THAT THE FTC STAFF HAS EXPRESSLY DISAVOWED. ............................. 11

II.    ILLINOIS'S COMMUNICATION OF PLAINTIFF'S DRIVING HISTORY RECORD WAS NOT A "CONSUMER REPORT" AND DID NOT BECOME ONE WHEN IT PASSED THROUGH DEFENDANT'S HANDS. ................................................................. 13

III.    THE CONVICTION INFORMATION REPORTED BY ILLINOIS WAS NOT PART OF ANY "FILE" MAINTAINED BY LNRS REGARDING PLAINTIFF AND THEREFORE COULD NOT BE "DISPUTED" WITH LNRS. ...................................................... 15

IV.    EVEN IF DEFENDANT WAS A "CONSUMER REPORTING AGENCY," PLAINTIFF CANNOT MAKE OUT HIS PLEADED CLAIMS, SINCE THE REPORT ACCURATELY DESCRIBED HIS ILLINOIS DRIVING RECORD WHEN THE REPORT WAS MADE. .....16

    A.    Each of Plaintiff's Claims Requires Plaintiff to Show That LNRS Prepared a "Consumer Report" About Him That Was "Inaccurate." ...................................................................... 16

           CASE NO. 14cv1635 JAH (NLS)

B.    LNRS's Communication to Commerce Purported Only to Describe What Illinois Showed Plaintiff's Driving Record to Be, Not What Illinois "Should" Have Shown His Driving Record to Be, and Was Therefore Accurate. ........................................................ 17

C.    Ninth Circuit Case Law Is Consistent with This Result. ................... 18

V.    A "CONSUMER REPORTING AGENCY" IS NOT REQUIRED TO INDEPENDENTLY VERIFY EACH ITEM OF INFORMATION OBTAINED FROM A DATA FURNISHER. ............................................... 20

CONCLUSION ..................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Cahlin v. Gen. Motors Acceptance Corp.,*
  936 F.2d 1151 (11th Cir. 1991) ........................................................ 16

*Carlton v. Choicepoint, Inc.,*
  No. 08-5779-RBK/KMW,
  2009 U.S. Dist. LEXIS 109522 (D.N.J. Nov. 23, 2009) .................................. 14

*Carvalho v. Equifax Info. Servs., LLC,*
  629 F.3d 876 (9th Cir. 2010) ........................................... 17, 18, 19, 20

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ........................................................ 10

*Dennis v. BEH-1, LLC,*
  520 F.3d 1066 (9th Cir. 2008) ........................................................ 17

*Devereaux v. Abbey,*
  263 F.3d 1070 (9th Cir. 2001) (en banc) ........................................ 10

*Gillespie v. Trans Union Corp.,*
  482 F.3d 907 (7th Cir. 2007) ........................................................ 9, 15

*Guimond v. Trans Union Credit Information Co.,*
  45 F.3d 1329 (9th Cir. 1995) ........................................................ 16

*Henson v. CSC Credit Servs.,*
  29 F.3d 280 (7th Cir. 1994) ........................................................ 22

*Makas v. New York State DMV,*
  No. 97-CV-1892-NPM,
  1998 U.S. Dist. LEXIS 3840 (N.D.N.Y Mar. 23, 1998) ............................... 14

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.,*
  210 F.3d 1099 (9th Cir. 2000) ........................................................ 10

*Ollestad v. Kelley,*
  573 F.2d 1109 (9th Cir. 1978) ........................................................ 14

*Ori v. Fifth Third Bank,*
  603 F. Supp. 2d 1171 (E.D. Wis. 2009) ........................................ 15

iii

CASE NO. 14cv1635 JAH (NLS)

*Prianto v. Experian Info. Solutions, Inc.*,
   No. 13-cv-03461-THE,
   2014 U.S. Dist. LEXIS 94673 (N.D. Cal. July 10, 2014) ........................... 17, 18

*Ricci v. Key Bancshares of Maine, Inc.*,
   768 F.2d 456 (1st Cir. 1985) ............................................................. 14

*Williams v. Colonial Bank*,
   826 F. Supp. 415 (M.D. Ala. 1993) ...................................................... 17

**STATUTES**

15 U.S.C.
   § 1012(b) .................................................................................... 21
   § 1681 *et seq.* .......................................................................... 1, 3
   § 1681a(d) ................................................................................... 13
   § 1681a(d)(1) ............................................................................ 9, 15
   § 1681a(f) ................................................................................ 9, 14
   § 1681a(g) ..................................................................................... 9
   § 1681e(b) ............................................................................... *passim*
   § 1681i ............................................................................ 15, 16, 17, 18
   § 1681i(a)(1)(A) ............................................................................... 9

625 ILCS 5/2-123(f-5)(6) ................................................................ 2, 21

Cal. Veh. Code § 1808.10 .................................................................. 21

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub. L. No. 111-203, Title X, 124 Stat. 1376 (2010) ................................. 11

**OTHER AUTHORITIES**

16 C.F.R. pt. 600, app. at § 603(g) cmt. 1 (1990)
   (rescinded at 76 Fed. Reg. 44462, 44463 (July 26, 2011)) .............. 9, 12, 21, 22

16 C.F.R. pt. 600, app. § 603 ............................................................ 15

16 C.F.R. pt. 600, app. at § 607(b) cmt. 3A (rescinded July 26, 2011) ................ 21

16 C.F.R. pt. 600, app. at § 607(b) cmt. 3D (rescinded July 26, 2011) ................ 22

Federal Trade Commission, *40 Years of Experience with the Fair Credit
   Reporting Act, an FTC Staff Report with Summary of Interpretations,*
   July 2011 ............................................................................. 12, 14, 16

Fed. R. Civ. P. 56(a) ............................................................................................ 10

CASE NO. 14CV1635 JAH (NLS)

# INTRODUCTION

Each of Plaintiff's claims rests upon the false premise that reports regarding his driving history that Defendant LexisNexis Risk Solutions Inc. ("LNRS") obtained from the State of Illinois for Commerce Insurance Company ("Commerce") were "consumer reports" prepared by a "consumer reporting agency" within the meaning of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA"). Because LNRS merely acted as a conduit for information about Plaintiff published by the State of Illinois, LNRS did not act as a "consumer reporting agency" with respect to Plaintiff, the reports were not "consumer reports," and no FCRA claims lie with respect to the reports LNRS procured on Commerce's behalf. LNRS is entitled to summary judgment.

# FACTUAL SETTING

## A.    LNRS's MVR Product

Automobile insurance companies rely, in part, on drivers' driving histories when "underwriting" and "rating" insurance—i.e., determining whether to insure a consumer or business, and if so, the rate to charge for the insurance. (Declaration of Mani Young ("Young Decl."), ¶ 4.) Licensing states—usually through a department of motor vehicles ("DMV")—maintain records of individual driving history, often referred to as "Motor Vehicle Records" or "MVRs," as part of their administration of state driver licensing laws. (*Id.*) State laws generally permit insurance companies to obtain such driving histories from the state for a fee for purposes of underwriting insurance. (*Id.*) LNRS offers insurance companies a service—the MVR product—with which insurers can obtain either a driving history prepared for the insurer by the licensing state (a "State Report") or an LNRS-supplied alternative ("Alternative Report") in order to underwrite insurance. (*Id.*)

### 1.    State Reports

"State Reports" are prepared for a customer by the state, district, or territory in which a driver is licensed, and may include identifying information for the

1    driver, license type, and driving-related convictions reflected in the state's records
2    at the time the report is prepared.  (*Id.*, ¶ 5.)  While the terms of the agreements
3    differ to some degree, LNRS has secured agreements with all 50 states, the District
4    of Columbia and the territory of Puerto Rico, under which LNRS may obtain these
5    official abstracts of driving records on behalf of authorized users of such
6    information, such as insurance companies.  (*Id.*)  Such authorized users could
7    obtain the information themselves from the state or from its DMV or equivalent
8    agency, but LNRS offers insurance companies the convenience of a single point of
9    access to order and obtain State Reports from DMVs across the country.  (*Id.*)
10   Some states, including Illinois, permit LNRS to keep a copy of a State Report for a
11   period of time so that the customer that ordered the original report can have
12   continued access to the report.  (*Id.*)

13       One of the DMVs from which LNRS orders State Reports for insurance
14   companies is the Illinois DMV, known as the Driver Services Department.  (*Id.*,
15   ¶ 7.)  The motor vehicle data to which LNRS has on-line access under its agreement
16   with the State of Illinois are public records: "information maintained in [computer
17   files of the Driver Services Department of the Office of the Secretary of State of
18   Illinois] which [are] now available by a manual search of the [Secretary of State]
19   records."  (*Id.*, ¶ 3, Exh. 19 at 1.)  The information sold by the State "is compiled by
20   [the Illinois Secretary of State] as required by statute and for its own public
21   purposes."  (*Id.*, Exh. 19 at 4.)  By statute, such information may be sold by the
22   State of Illinois to insurance carriers and insurance agents "in connection with
23   claims investigation activities, antifraud activities, rating and underwriting."
24   625 ILCS 5/2-123(f-5)(6).  The contract under which LNRS has on-line access to
25   Illinois data provides that "[LNRS] may not enter any information on any
26   [Secretary of State] file, nor may [LNRS] alter, or attempt to alter, any existing
27   [Secretary of State] file in any form."  (Young Decl., ¶ 3, Exh. 19 at 3.)

28

## 2.   LNRS Alternative Reports

Insurance companies, in some circumstances, are willing to underwrite or rate policies using information other than State Reports if such information is available.  (*Id.*, ¶ 8.)  LNRS offers authorized users the option of purchasing, for some drivers, "Alternative Reports."  (*Id.*)  Alternative Reports are not available for all U.S. states, and for those states where they are available, have been available for different periods of time.  Hence, Alternative Reports have not been available at all times for all drivers.  (*Id.*)  In December, 2013, and January, 2014, for drivers licensed by Illinois, LNRS did not offer Alternative Reports derived from Illinois Driver Services Department data.  (*Id.*)  For drivers licensed by Illinois, LNRS offered only Alternative Reports derived from Illinois court records, along with State Reports.  (*Id.*)

## 3.   Choosing Between a State Report and an Alternative Report

LNRS's Motor Vehicle Records product ("MVR product") offers subscribers the ability to choose to obtain Alternative Reports, where available, to evaluate an individual's driving history or to instead specify that for a particular consumer, the subscriber wishes to order a State Report.  (*Id.*, ¶ 9.)  LNRS uses the "MVR" descriptor for both State Reports and Alternative Reports.  (*Id.*)

LNRS advises insurance company customers that MVR Reports are not, in all cases, "consumer reports" under the FCRA.  LNRS's website expressly advises customers that "Motor Vehicle Records is a consumer reporting agency product . . . and is fully compliant with the Fair Credit Reporting Act, 15 U.S.C. 1681 et seq. There are circumstances in which motor vehicle records do NOT qualify as consumer reports.  Please consult your attorney in making this determination."  (*Id.*, ¶ 10; Complaint ("Compl."), Exh. A (emphasis in original).)  The disclosure regarding the "circumstances in which motor vehicle records do NOT qualify as consumer reports" is intended to include, among other things, motor vehicle records that are State Reports.  (Young Decl., ¶ 10.)

### B.      Plaintiff's Experience in Indiana

While driving in Indiana in January, 2010, Plaintiff (then an Illinois resident, licensed to drive by the State of Illinois) was stopped by a law enforcement officer and issued several citations, including a citation for speeding.  (Compl., ¶¶ 14, 22.) Plaintiff contested the citations, and in an Indiana court proceeding in May, 2010, pleaded guilty to an amended charge of driving without a license in his possession, a charge that was not included in the original list of citations.  (*Id.*, ¶ 15, Exh. B.)

### UNDISPUTED MATERIAL FACTS

In November, 2013, Plaintiff applied for new automobile insurance with Commerce Insurance Company.  (Statement of Undisputed Material Facts ("UMF") 1.)

Commerce and LNRS have a contract under which LNRS "will order for and return to [Commerce] MVRs from certain states when so requested by [Commerce]."  (UMF 2.)  LNRS obtains such reports from the state or territory in which the subscriber reports the consumer to be licensed.  (UMF 4.)

On December 6, 2013, Commerce ordered a report of Plaintiff's driving history with LNRS by completing a web page similar to the following.[1]  (UMF 5.)

---

[1] Commerce at the same time ordered a separate report on Plaintiff, called a C.L.U.E. Auto report, prepared by LNRS from a database it maintains containing information on policyholder insurance claims.  (UMF 13.)  The C.L.U.E. Auto report on Plaintiff did not contain any reference to the reported speeding conviction Plaintiff contends was inaccurate.  (UMF 15.)

4

Commerce indicated in its order that Plaintiff was licensed to drive by the State of Illinois.  (UMF 6.)  Further, Commerce specified in its order that LNRS should obtain a State Report on Plaintiff directly from the State of Illinois.  (UMF 7.) LNRS then ordered for Commerce a State Report on Plaintiff from Illinois. (UMF 9.)

Illinois responded within seconds to LNRS's order with Illinois DMV records indicating that Plaintiff was convicted on May 20, 2010, of exceeding the speed limit by 15-25 miles per hour on January 29, 2010.  (UMF 10.)  The data received from Illinois was:

```
$ ████████████                     5042600
     0001220131205201410070166030273              ████████  199803120
FEINSTEIN<SCOTT<D
990020100129201005208060105000000008941401345     00000000
}{12-06-13 10:55:42 81003019710980 ████████    FEINSTEIN    SCOTT
```

The fourth line, commencing with the numbers "99", contained the codes indicating

the speeding violation.[2]  (Declaration of Levi Pickett ("Pickett Decl."), ¶ 5.)

Within seconds of its receipt of this information from Illinois, LNRS

transmitted to Commerce the information it received from Illinois, including the

explanation "Speeding 15-25 above limit" derived from an offense table Illinois

supplied to LNRS and the offense (EDPM) code reported by Illinois.  (UMF 11.)

When passed on to Commerce, the information was presented as:

```
                    LexisNexis Risk Solutions

 DRIVER RECORD INFORMATION obtained by LexisNexis Risk Solutions on customer's
   behalf from the motor vehicle records of the state/province of Illinois.
         Identification of driver is based on information submitted.

Name/Address                Quoteback
FEINSTEIN, SCOTT D          DXR921 LW
[QB_45TWTI2:02000ACMVT6Q02000
████████   IL  60302

Driver License Number   Rpt Date    System Use              Account Number
████████                12/06/2013  000000000000000         710980

Social Security Number  DMV Account Number
                        0000

DOB        Sex Hgt  Wt   Eyes Hair Requested as/Also Known As
           ████████████      ████████████

                    DRIVER LICENSE INFORMATION
-----------------------------------------------------------------------------
-
Class           Issued      Expire    Status         Restrictions
DM-GVWR<16000,CYCLE 12/05/2013 10/07/2014 VALID

         MISCELLANEOUS AND STATE SPECIFIC INFORMATION
```

---

[2] By agreement of Plaintiff's counsel, LNRS has redacted personal identifying information, including driver license number, address, and date of birth, from this brief, certain exhibits, and the Declaration of Kimberly Lane, but will be serving unredacted copies to Plaintiff's counsel in order for them to confirm accuracy.

CASE NO. 14CV1635 JAH (NLS)

```
---------------------------------------------------------------------
-
DOB REPORTED FROM CUSTOMER ORDER DATA SINCE DMV DOES NOT PROVIDE DOB
TYPE LICENSE: COPY OF LICENSE ISSUED
DRIVERS ED: NO
COMMERCIAL DRIVER LICENSE: NO
CONTINUOUS LICENSE DATE: 03/12/98
ORDERED AS:       ███████████

                               DRIVING RECORD
---------------------------------------------------------------------
-
     Vio/Sus    Conv/Rein     Description                   Vio/Conv
Pts
Type  Date       Date                                        Code
CONV  01/29/2010 05/20/2010
                   SPEEDING 15-25 MPH ABOVE LIMIT
                   DOC: 1345        COURT: 89414
                   EDPM CODE:060105                  8 0601 05  20
          CPS/SVC: 311FH V
                   SPEED 15-25 OVER LIMIT
```

(Declaration of Kimberly Lane ("Lane Decl."), ¶ 9, Exh. 23.) The information was clearly labelled as "DRIVER RECORD INFORMATION obtained by LexisNexis Risk Solutions on customer's behalf from the motor vehicle records of the state/province of Illinois." (UMF 12.)

Plaintiff alleges that Commerce increased Plaintiff's insurance rates by reason of a reported conviction on May 20, 2010, for speeding on January 29, 2010. (Compl., ¶¶ 17-18.) Commerce advised Plaintiff that it relied on information from LNRS[3] in making its decision. (*Id.*, ¶¶ 18-19, Exh. D.) Commerce stated that its decision was "based in whole or in part on information provided by a Consumer Report" from LNRS. (*Id.*)

In a letter to ChoicePoint Services dated December 16, 2013, which was received by LNRS on December 20, Plaintiff demanded that LNRS "immediately

---

[3] Commerce actually named as its source "ChoicePoint Services, Inc.," a predecessor company to LNRS. (Compl., Exh. D.)

remove this speeding conviction from my record as it is false." [4]  (*Id.*, ¶ 20, Exh. F.)

LNRS wrote Plaintiff on December 20, 2013, stating:

> You requested a change to inaccurate information on your Motor Vehicle Report (MVR).  LexisNexis procedure[] is to obtain your motor vehicle record from the department of motor vehicle[s] and forward the information to the company requesting the report.  MVRs are maintained by the department of motor vehicles.  You will need to contact the Motor Vehicle department to look into possible errors.

(UMF 20.)  Plaintiff contacted the State of Illinois (Compl., ¶ 22, Exh. H), and by the end of January, 2014, Illinois no longer reported an out-of-Illinois speeding conviction for Plaintiff in May, 2010.  (UMF 27 (January 30, 2014 driving history from Illinois no longer shows speeding conviction).)  Plaintiff alleges that Commerce then lowered Plaintiff's insurance rates.  (Compl., ¶¶ 23-24.)

## PLAINTIFF'S CLAIMS

Plaintiff alleges that the State Report that Defendant procured from Illinois for Commerce was a "consumer report," and that Defendant willfully violated the FCRA by:  1) failing to adopt procedures to assure the maximum possible accuracy of the "consumer report" about him that Defendant provided to Commerce (Compl. ¶¶ 44-53, citing 15 U.S.C. § 1681e(b)) and 2) refusing to conduct a reinvestigation after he disputed the accuracy of the speeding conviction allegedly reflected in LNRS's "file" regarding Plaintiff.  (Compl. ¶¶ 34-43, citing 15 U.S.C. § 1681i.)

LNRS denies that the State Report provided to Commerce was a "consumer report," and further denies that it was obligated to reinvestigate an alleged error in Illinois's records.

---

[4] Plaintiff may also have contacted Commerce, as Commerce again ordered MVRs from the State of Illinois on December 18, 2013, and January 30, 2014. (UMF 21, 27.)  The information returned by the State of Illinois on the December 18 order was the same as the information returned on December 6.  (UMF 22.) State Fund Insurance Company ordered an MVR on Plaintiff on January 6, 2014, which was fulfilled by obtaining a report from Illinois on State Fund's behalf. (UMF 23, 24.)  The January 6 report from Illinois also contained the challenged speeding conviction.  (UMF 25.)

**RELEVANT STATUTES**

15 U.S.C. § 1681e(b) provides: "Whenever a *consumer reporting agency* prepares a *consumer report* it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  (Emphasis added.)  15 U.S.C. § 1681i(a)(1)(A) provides, in part, "if the completeness or accuracy of any item of information contained in a consumer's *file* at a *consumer reporting agency* is disputed by the consumer . . . the agency shall . . . conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate[.]"  (Emphasis added.)

A "consumer report" under the FCRA is defined in relevant part to include a "communication of any information *by a consumer reporting agency*" that bears on certain consumer characteristics and that is expected to be used as a factor in establishing the consumer's eligibility for insurance.  15 U.S.C. § 1681a(d)(1) (emphasis added).

A "file" is defined in the FCRA in relevant part as "all of the information on [the] consumer recorded and retained *by a consumer reporting agency* regardless of how the information is stored."  15 U.S.C. § 1681a(g) (emphasis added).  The FTC and courts have limited the term "file" to information "that might be furnished, or has been furnished, in a consumer report on that consumer."  16 C.F.R. pt. 600, app. at § 603(g) cmt. 1 (1990) (rescinded at 76 Fed. Reg. 44462, 44463 (July 26, 2011)), cited with approval in *Gillespie v. Trans Union Corp.*, 482 F.3d 907, 909 (7th Cir. 2007).

Both the definitions of "consumer report" and "file" depend on the action at issue being taken "by a consumer reporting agency."  A "consumer reporting agency" is defined in relevant part as "any person which," (1) "for monetary fees," (2) "regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers" (3) "for

1   the purpose of furnishing consumer reports to third parties[.]"  15 U.S.C.

2   § 1681a(f).

3   **LEGAL STANDARD**

4   A court "shall grant summary judgment if the movant shows that there is no

5   genuine dispute as to any material fact and the movant is entitled to judgment as a

6   matter of law."  Fed. R. Civ. P. 56(a).  "The moving party may produce evidence

7   negating an essential element of the nonmoving party's case, or, after suitable

8   discovery, the moving party may show that the nonmoving party does not have

9   enough evidence of an essential element of its claim or defense to carry its ultimate

10   burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

11   F.3d 1099, 1106 (9th Cir. 2000).  As here, "[w]hen the nonmoving party has the

12   burden of proof at trial, the moving party need only point out 'that there is an

13   absence of evidence to support the nonmoving party's case.'"  *Devereaux v. Abbey*,

14   263 F.3d 1070, 1076 (9th Cir. 2001) (en banc) (quoting *Celotex Corp. v. Catrett*,

15   477 U.S. 317, 325 (1986)).  Summary judgment is appropriate "against a party who

16   fails to make a showing sufficient to establish the existence of an element essential

17   to that party's case, and on which that party will bear the burden of proof at trial."

18   *Celotex*, 477 U.S. at 322.

19   **ARGUMENT**

20   Both of Plaintiff's claims are predicated on the false premise that the Illinois

21   driving history that LNRS "order[ed] for and return[ed] to" Commerce was a

22   "consumer report" within the meaning of the FCRA.  It was not.  Driving histories

23   prepared by state motor vehicle bureaus are not "consumer reports," and they do

24   not become "consumer reports" just because they pass through the hands of another

25   entity (here LNRS).  Because the State Report that LNRS ordered for and returned

26   to Commerce was not a "consumer report," the FCRA does not apply to the report.

27   And because LNRS was not then preparing Alternative Reports on Illinois drivers

28   derived from Illinois Driver Services Department information, the information was

not part of a "file" capable of being disputed, and Plaintiff cannot prevail on any FCRA claim with respect thereto.

Even if the State Report LNRS retrieved from Illinois for Commerce was a "consumer report," LNRS is still entitled to summary judgment on both claims.  A private plaintiff asserting either a "maximum possible accuracy" or a "reinvestigation" claim under the FCRA must show that a "consumer reporting agency" had information in its "file" which did result, or could have resulted, in an inaccurate consumer report regarding the plaintiff.  Because Commerce ordered from LNRS Plaintiff's driving history as then reported by Illinois, and because LNRS accurately communicated to Commerce what Illinois reported to be Plaintiff's driving history, Plaintiff cannot prove an element essential to each of his claims.  In addition, Plaintiff's theory underlying his "maximum possible accuracy" claim—that a consumer reporting agency may not use data from an official source without first reverifying that data—is simply wrong.  This theory has been expressly repudiated by both the Seventh Circuit and the Federal Trade Commission at a time when it was the agency with principal responsibility for enforcement of the FCRA.

Summary judgment is properly entered in LNRS's favor.

## I.    PLAINTIFF'S CASE IS FOUNDED ON A LEGAL THEORY THAT THE FEDERAL TRADE COMMISSION ADOPTED IN COMMENTARY WHICH HAS BEEN RESCINDED AND THAT THE FTC STAFF HAS EXPRESSLY DISAVOWED.

Plaintiff's case is explicitly based on the premise that driving histories published by state departments of motor vehicles are "consumer reports" under the FCRA.  (Compl., ¶ 12.)  The premise is false.

From the passage of the FCRA in 1970 until the effective date of the Consumer Financial Protection Act ("CFPA")[5] in 2011, the FTC had principal

---

[5] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, Title X, 124 Stat. 1376 (2010).

interpretive and enforcement authority with respect to the FCRA.  In 1990, the Commission summarized guidance it had provided in the preceding twenty years in the form of formal and informal opinion letters and interpretations.  In the 1990 Commentary, the FTC took the position that state departments of motor vehicles were "consumer reporting agencies" because they sold driver history information to insurance companies:

> Motor vehicle reports are distributed by state motor vehicle departments, generally to insurance companies upon request, and usually reveal a consumer's entire driving record, including arrests for driving offenses. Such reports are consumer reports when they are sold by a Department of Motor Vehicles for insurance underwriting purposes and contain information bearing on the consumer's "personal characteristics," such as arrest information.

16 C.F.R. pt. 600, app. at § 603(d) cmt. 4C (rescinded at 76 Fed. Reg. 44462, 44463 (July 26, 2011)).  Plaintiff's complaint cites the Commentary quoted above for the proposition that "Lexis's MVR reports are consumer reports within the meaning of the FCRA."  (Compl., ¶ 12.)

When interpretive authority regarding the FCRA passed to the newly created Consumer Financial Protection Bureau ("CFPB") in 2011, the FTC elected not to transfer to the CFPB the FCRA interpretations embodied in the 1990 Commentary, but instead to rescind them, in part due to the fact that the Commentary had not been updated to reflect several major revisions of the FCRA.  76 Fed. Reg. 44462 (July 26, 2011).  Concurrent with the FTC action rescinding the 1990 Commentary, FTC staff published "40 Years of Experience With the Fair Credit Reporting Act; An FTC Staff Report With Summary of Interpretations, July 2011" ("40 Years Report").[6]  The FTC staff published the report as "a compendium of interpretations . . . it believes will be of use to the CFPB staff, the businesses subject to the

---

[6] The 40 Years Report is available at http://www.ftc.gov/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations (last visited Jan. 16, 2015).

1    Commission's jurisdiction under the FCRA, public representatives and consumers."

2    *Id.* at 7.

3        The 40 Years Report highlighted five areas in which the FTC's interpretation

4    of the FCRA had changed.  Among the positions repudiated by the 40 Years Report

5    was the conclusion, quoted above and in Plaintiff's complaint, that motor vehicle

6    bureaus are "consumer reporting agencies":

7                Staff does not adopt the 1990 Commentary's positions
                 that a Department of Motor Vehicles ("DMV") providing
8                motor vehicle reports for insurance underwriting purposes
                 can be a "consumer reporting agency."
9

10   *Id.* at 8.  Noting that characterizing a government source of public records as a

11   "consumer reporting agency" would lead to absurd results (including the inability

12   of the agency to furnish records to the public) (*id.* at 9), the staff noted that "[t]he

13   Commission has never enforced the FCRA against any DMV or other government

14   agency supplying public records" (*id.* at 8), and that the staff had issued opinion

15   letters to a state Highway Patrol, a state Department of Public Investigation and a

16   state Department of Public Safety opining that their furnishing of public record data

17   to a third party did not make them "consumer reporting agencies."  *Id.* at 9.  "For

18   these reasons," the 40 Years Report concluded, "the Staff Summary does not

19   incorporate the 1990 Commentary interpretations with respect to DMVs."  *Id.* at 10.

20       The FTC has thus expressly rescinded and repudiated the core contention of

21   Plaintiff's complaint: that a state DMV becomes a "consumer reporting agency"

22   simply by furnishing driver history records from databases maintained by the DMV

23   and that driver histories are in all instances "consumer reports."

24   **II.   ILLINOIS'S COMMUNICATION OF PLAINTIFF'S DRIVING**
         **HISTORY RECORD WAS NOT A "CONSUMER REPORT" AND DID**
25       **NOT BECOME ONE WHEN IT PASSED THROUGH DEFENDANT'S**
         **HANDS.**
26

27       The undisputed facts demonstrate that LNRS "order[ed] for and return[ed] to

28   [Commerce] MVR[s] from [Illinois] when so requested by [Commerce]."  (UMF 2,

                                    13                    CASE NO. 14cv1635 JAH (NLS)

9.)  None of the reports on Plaintiff was a "consumer report" when prepared by Illinois, and none became a "consumer report" by passing through LNRS's hands.

Under the FCRA, a "consumer report" consists of a communication of information "by a consumer reporting agency."  15 U.S.C. § 1681a(d).  The FTC staff has opined (40 Years Report at 8-9), and courts including the Ninth Circuit have repeatedly held,[7] that government agencies providing public records are not "consumer reporting agencies."  In providing such public records, the State of Illinois is therefore not a "consumer reporting agency," and the driver history reports on Plaintiff that Commerce and State Fund ordered from Illinois through LNRS were thus not "consumer reports."

The fact that Illinois's reports were handled by LNRS in transit from Illinois to the insurance companies does not change their characterization.  Where an entity merely acts as a conduit for information prepared or provided by others, it does not operate as a "consumer reporting agency" because it is not engaged, with respect to the communication at issue, in "assembling or evaluating . . . information on consumers."  15 U.S.C. § 1681a(f); 40 Years Report at 29 ("<u>Conduit functions</u>.  An entity that performs only mechanical tasks in connection with transmitting consumer information is not a [consumer reporting agency] because it does not assemble or evaluate information."); *Carlton v. Choicepoint, Inc.*, No. 08-5779-RBK/KMW, 2009 U.S. Dist. LEXIS 109522, at *10-11, 15 (D.N.J. Nov. 23, 2009) (collecting cases for point that "assembling or evaluating" phrase "implies a

---

[7] *See Ollestad v. Kelley*, 573 F.2d 1109, 1110-11 (9th Cir. 1978) (affirming summary judgment on grounds that "the FCRA does not apply to records held by federal agencies"—"It cannot be contended seriously that agencies such as the F.B.I. compile information on persons . . . for the purpose of furnishing consumer reports to third parties."); *Ricci v. Key Bancshares of Maine, Inc.*, 768 F.2d 456, 466 (1st Cir. 1985) ("The FBI is not a 'consumer reporting agency' as defined under the statute.") (citation omitted); *Makas v. New York State DMV*, No. 97-CV-1892-NPM, 1998 U.S. Dist. LEXIS 3840, at *6-10 (N.D.N.Y Mar. 23, 1998) (dismissing DMV for lack of waiver of sovereign immunity, and dismissing Keybank because complaint did not allege that it "furnishes reports containing consumer credit information or other information on consumers to third parties and therefore, [it] cannot be considered a 'consumer reporting agency'").

1    function which involves more than receipt and retransmission of information," and

2    dismissing claim because defendant was "merely a conduit of information, as

3    opposed to an entity that in any way re-organizes or filters information" (citation

4    omitted)).  Simply put, "[o]btaining and forwarding information does not make an

5    entity a [consumer reporting agency]."  *Ori v. Fifth Third Bank*, 603 F. Supp. 2d

6    1171, 1175 (E.D. Wis. 2009) (citation omitted).  LNRS acted only as a conduit; it

7    did not "assemble" or "evaluate" the State of Illinois's reports on Plaintiff, and thus

8    did not act as a "consumer reporting agency" with respect thereto.  Illinois's State

9    Reports on Plaintiff did not become "consumer reports" simply because they were

10   handled by LNRS.

11          Because LNRS furnished no "consumer reports" on Plaintiff, and because it

12   therefore did not act as a "consumer reporting agency" with respect to him,

13   summary judgment should be entered in LNRS's favor on both of his claims.

14   **III.   THE CONVICTION INFORMATION REPORTED BY ILLINOIS
15          WAS NOT PART OF ANY "FILE" MAINTAINED BY LNRS
            REGARDING PLAINTIFF AND THEREFORE COULD NOT BE
16          "DISPUTED" WITH LNRS.**

17          LNRS is entitled to summary judgment on Plaintiff's first claim for the

18   additional reason that the conviction information reported by Illinois was not part of

19   any "file" maintained by LNRS regarding Plaintiff.

20          Plaintiff's "dispute" claim under 15 U.S.C. § 1681i derives from his demand

21   that LNRS "remove this speeding conviction from my record."  (Compl., ¶¶ 20, 38-

22   39, Exh. F.)  However, section 1681i applies only to "item[s] of information

23   contained in a consumer's *file* at a consumer reporting agency. . ."  (Emphasis

24   added.)  A "file" is limited to information "that might be furnished, or has been

25   furnished, in a consumer report on that consumer."  16 C.F.R. pt. 600, app. § 603,

26   cited with approval in *Gillespie*, 482 F.3d at 909.  Thus, the statute would apply in

27   the present case only if the speeding conviction was in a "file" on Plaintiff

28

1  maintained by LNRS from which LNRS had prepared or might prepare "consumer
2  reports."  It was not, and the statute therefore did not apply.

3        First, the conviction information had never been included by LNRS in a
4  "consumer report," since all of the reports reflecting the conviction were prepared
5  by the State of Illinois, which is not a "consumer reporting agency."  *See* 15 U.S.C.
6  § 1681a(d)(1) ("consumer report" is a "communication . . . by a consumer reporting
7  agency"); 40 Years Report at 8.  The conviction information did not meet the "has
8  been furnished[] in a consumer report" branch of the "file" definition.

9        Second, there was no chance that the challenged conviction information
10 "might be furnished" in a "consumer report."  At the time of the dispute, LNRS was
11 not using Illinois Driver Services Department information to prepare its own
12 reports on Illinois drivers.  (UMF 28, 29.)  The only reports then available through
13 LNRS on Illinois drivers were State Reports, compiled by Illinois, or Alternative
14 Reports derived from Illinois court records.  (UMF 29.)  The Illinois court records
15 did not include records of proceedings in non-Illinois courts.  (UMF 30.)  The
16 conviction information thus did not meet the "might be furnished" branch of the
17 "file" definition, either.

18       The challenged conviction information was thus not part of an LNRS "file"
19 on Plaintiff, and was not the proper subject of a reinvestigation request under
20 15 U.S.C. § 1681i.

21       LNRS is entitled to summary judgment on Plaintiff's first cause of action.

**IV.   EVEN IF DEFENDANT WAS A "CONSUMER REPORTING
       AGENCY," PLAINTIFF CANNOT MAKE OUT HIS PLEADED
       CLAIMS, SINCE THE REPORT ACCURATELY DESCRIBED HIS
       ILLINOIS DRIVING RECORD WHEN THE REPORT WAS MADE.**

   **A.   Each of Plaintiff's Claims Requires Plaintiff to Show That LNRS
          Prepared a "Consumer Report" About Him That Was
          "Inaccurate."**

27       To make out a prima facie violation of 15 U.S.C. § 1681e(b) (maximum
28 possible accuracy of consumer reports), "a consumer must present evidence tending

1   to show that a credit reporting agency prepared a report containing inaccurate

2   information." *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329,

3   1333 (9th Cir. 1995); *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151,

4   1156 (11th Cir. 1991) ("If he fails to satisfy this initial burden, the consumer, as a

5   matter of law, has not established a violation of [§ 1681e(b)], and a court need not

6   inquire further as to the reasonableness of the procedures adopted by the credit

7   reporting agency.").  Similarly, a consumer must show that the challenged

8   information was inaccurate to make out a claim for violation of 15 U.S.C. § 1681i

9   (reinvestigation of disputed information).  *Williams v. Colonial Bank*, 826 F. Supp.

10  415, 418 (M.D. Ala. 1993) (no duty to reinvestigate where "the credit report

11  accurately reflect[s] the status of the information contained in the public records"),

12  cited with approval in *Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1069 (9th Cir. 2008);

13  *see also Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2010)

14  (interpreting California Credit Reporting Agency Act, by analogy to FCRA, to

15  require prima facie showing of inaccuracy to state a claim for failure to

16  reinvestigate); *Prianto v. Experian Info. Solutions, Inc.*, No. 13-cv-03461-THE,

17  2014 U.S. Dist. LEXIS 94673, at *25-26 (N.D. Cal. July 10, 2014).

18      **B.    LNRS's Communication to Commerce Purported Only to
           Describe What Illinois Showed Plaintiff's Driving Record to Be,**
19         **Not What Illinois "Should" Have Shown His Driving Record to Be,
           and Was Therefore Accurate.**
20

21      When LNRS provided Commerce with Illinois's State Report on Plaintiff,

22  LNRS did not represent to Commerce that Plaintiff had, in fact, been convicted of

23  speeding in an unspecified jurisdiction in May, 2010.  The contract between LNRS

24  and Commerce makes clear that where LNRS supplies Commerce with an MVR

25  from a state Motor Vehicle Department, it is supplying whatever the insurer would

26  find by going directly to the licensing state itself.  LNRS agrees to "order [MVRs]

27  for" Commerce "from certain states" and to "return [such MVRs] to" Commerce.

28  (UMF 2.)  The contract expressly emphasizes that data is supplied "as is" and

1  disclaims any warranty as to its accuracy.  (UMF 3.)  The contract thus promised

2  only that LNRS would obtain from Illinois the same information Commerce would

3  have obtained had Commerce gone to the State itself.

4  Given what LNRS and Commerce had agreed as to what LNRS was doing in

5  providing Commerce with a State Report on Plaintiff, and given the limits imposed

6  by LNRS's contract with Illinois, the threshold "accuracy" inquiry here is "Did

7  LNRS accurately describe to Commerce the contents of Plaintiff's driving history

8  file with the Illinois Secretary of State?"

9  The undisputed facts establish that LNRS's report to Commerce was *not*

10  inaccurate.  LNRS's reference to a speeding conviction in its communication to

11  Commerce accurately repeated the speeding conviction information reported by

12  Illinois from its public records.  (UMF 10, 11.)  Because Plaintiff cannot establish

13  the prima facie showing of "inaccuracy" required for each of his claims, LNRS is

14  entitled to summary judgment.

15  **C.    Ninth Circuit Case Law Is Consistent with This Result.**

16  Even if LNRS's communication to Commerce could be said to be

17  "inaccurate," such inaccuracy was not of the sort that supports FCRA claims

18  against a consumer reporting agency.

19  Courts in this Circuit have on several occasions considered the sort of

20  "inaccuracy" a plaintiff must establish to make out a claim for violation of either

21  the "maximum possible accuracy" requirement of 15 U.S.C. § 1681e(b) or the

22  reinvestigation requirement of 15 U.S.C. § 1681i.  In brief, while consumer

23  reporting agencies may be held liable in connection with preparation of consumer

24  reports containing *patent* inaccuracies, they have no liability for *latent* inaccuracies.

25  *Prianto*, 2014 U.S. Dist. LEXIS 94673, at *19 ("[C]ontrolling Ninth Circuit law

26  forecloses liability for a CRA where the underlying debt is subject to *latent*

27  inaccuracy or when the inaccuracy of the debt turns on resolution of disputed legal

28  questions." (emphasis in original)).

The distinction between patent and latent inaccuracies has developed in cases involving reports of debts claimed by creditors to which consumers assert they have a legal defense.  In *Carvalho*, the plaintiff asserted a claim against a consumer reporting agency because it included a debt in a consumer report to which plaintiff contended she had a complete legal defense, and did not remove the debt following reinvestigation.  629 F.3d at 882-83.  The Court drew on a prior Ninth Circuit decision involving a creditor's FCRA reinvestigation obligation to distinguish between "patently incorrect" information, and information that is "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions."  *Id.* at 890-91 (quoting *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009), to distinguish between "patent" and "latent" inaccuracies in credit reports).  Noting that since the credit report accurately repeated what the furnisher had told the credit bureau, the Court concluded that there was no *patent* error in the report, only a claimed *latent* inaccuracy.  *Id.*  The Court characterized the plaintiff's claim to be that the credit bureaus should have assessed her defenses to the obligation once she filed a reinvestigation request.  *Id.*

> The fundamental flaw in Carvalho's conception of the reinvestigation duty is that credit reporting agencies are not tribunals.  They simply collect and report information furnished by others.  Because CRAs are ill equipped to adjudicate contract disputes, courts have been loath to allow consumers to mount collateral attacks on the legal validity of their debts in the guise of FCRA reinvestigation claims.

*Carvalho*, 629 F.3d at 891 (citing *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 150 (4th Cir. 2008)).

The fact that the FCRA does not afford plaintiffs like Carvalho a claim against a consumer reporting agency where furnishers of information misstate the legal significance of items they report does not mean that such plaintiffs are without remedies.  As the Ninth Circuit explained in *Carvalho*, where the challenged item was a reported debt rather than a reported speeding conviction,

> a consumer disputing the legal validity of a debt that
> appears on her credit report should first attempt to resolve
> the matter directly with the creditor or furnisher, which
> "stands in a far better position to make a thorough
> investigation of a disputed debt than the CRA does on
> reinvestigation."

*Carvalho*, 629 F.3d at 892 (quoting *Gorman*, 584 F.3d at 1156).  The Court continued: "[A] consumer who disputes the legal validity of an obligation [reported to a CRA by a furnisher] should do so directly at the furnisher level."  *Id.*

So here.  Illinois apparently for a time interpreted Plaintiff's guilty plea in Indiana as a guilty plea to speeding, and reflected in its public records a speeding conviction for Plaintiff.  That speeding conviction would have been communicated to any insurance company that requested Plaintiff's driving history from Illinois, either directly or through a record retriever such as LNRS.  And, while LNRS had the ability to retrieve Illinois driving records "as is," it was prohibited from changing them,[8] and could not have "corrected" Illinois's public records, even if it had been certain that the conviction Illinois reported without state attribution was the Indiana proceeding to which Plaintiff referred in his correspondence.  At LNRS's suggestion, Plaintiff went directly to the source of his public record driving history (UMF 26), and persuaded the State to delete the conviction from its public records.  (UMF 27.)  Plaintiff was able to resolve Illinois's error with Illinois, i.e., "directly at the furnisher level."  *Id.*

## V.     A "CONSUMER REPORTING AGENCY" IS NOT REQUIRED TO INDEPENDENTLY VERIFY EACH ITEM OF INFORMATION OBTAINED FROM A DATA FURNISHER.

Plaintiff alleges that LNRS breached the obligation to adopt reasonable procedures to assure the maximum possible accuracy of Plaintiff's "consumer report" when it obtained his driving history information from the Illinois agency

---

[8] The contract under which LNRS has on-line access to Illinois data provides that "[LNRS] may not enter any information on any [Secretary of State] file, nor may [LNRS] alter, or attempt to alter, any existing [Secretary of State] file in any form."  (Young Decl. ¶ 3, Ex. 19 at 3.)

1   responsible for maintaining drivers' driving histories and forwarded that

2   information to Commerce without first independently verifying it. (Compl., ¶¶ 47-

3   48.) This assertion both misapprehends what LNRS contractually agreed to supply

4   Commerce and misstates the FCRA.

5        As noted above, LNRS's contract with Commerce called for LNRS to "order

6   for and return to" Commerce public records of driving histories available in certain

7   states, including Illinois. (UMF 2.) There is only one source for official driver

8   history records maintained by Illinois: the State of Illinois. There is no second

9   source from which such records could be "verified," even if the FCRA imposed an

10  obligation to do so.[9]

11       What is more, even if LNRS's communication to Commerce were analyzed

12  as a statement that "Plaintiff has been convicted of speeding" rather than "Illinois

13  reports Plaintiff has been convicted of speeding," the fact that LNRS obtained the

14  information from the Illinois Secretary of State precludes any claim for violation of

15  section 1681e(b). In its 1990 Commentary, the FTC explained that section

16  1681e(b) permits consumer reporting agencies to rely on third parties for

17  information they furnish: "If a consumer reporting agency accurately transcribes,

18  stores and communicates consumer information received from a source that it

19  reasonably believes to be reputable, and which is credible on its face, the agency

20

21       [9] While he does not clearly say so, Plaintiff is actually objecting to the fact
    that in determining insurance rates, insurance companies rely on public record
22  abstracts of driving histories prepared by licensing states rather than commissioning
    research into court records each time a driver applies for insurance. Because, in his
23  case, the state's abstract apparently included an error, Plaintiff seeks to force
    universal re-verification of adverse information reported by states, by imposing
24  FCRA liability on intermediaries who facilitate insurers' on-line access to such
    information. State legislatures have authorized the sale of driver information to
25  insurers for underwriting purposes, reflecting state legislative judgment that such
    information is appropriate data to be used in insurance underwriting. *See, e.g.*,
26  625 ILCS 5/2-123(f-5)(6); Cal. Veh. Code § 1808.10. The FCRA may not be used
    to second-guess state legislative choices regarding the business of insurance.
27  15 U.S.C. § 1012(b) (McCarran-Ferguson Act) ("No Act of Congress shall be
    construed to invalidate, impair, or supersede any law enacted by any State for the
28  purpose of regulating the business of insurance . . . unless such Act specifically
    relates to the business of insurance.").

does not violate [§ 1681e(b)] simply by reporting an item of information that turns out to be inaccurate."  16 C.F.R. pt. 600, app. at § 607(b) cmt. 3A (rescinded at 76 Fed. Reg. 44462, 44463 (July 26, 2011)).  The FTC also stated:  "This section does not hold a consumer reporting agency responsible where an item of information that it receives from a source that it reasonably believes to be reputable appears credible on its face, and is transcribed, stored and communicated as provided by that source."  16 C.F.R. pt. 600, app. at § 607(b) cmt. 3D (rescinded July 26, 2011).  The FTC's analysis parallels the reasoning of a Seventh Circuit case.  *Henson v. CSC Credit Servs.*, 29 F.3d 280, 285-86 (7th Cir. 1994) (credit reporting agency not liable for reporting inaccurate information gathered from a court's judgment docket so long as it did not have prior notice that the information might be inaccurate).

It is reasonable as a matter of law to treat the State of Illinois as a reputable source of information about the driving histories the state maintains on its licensed drivers.  LNRS is therefore entitled to summary judgment on Plaintiff's claim that it violated section 1681e(b) by forwarding to Commerce and State Fund information obtained from Illinois without first re-verifying it.

## CONCLUSION

For each of the reasons set forth above, Defendant respectfully requests that the Court grant its Motion for Summary Judgment as to both of Plaintiff's claims.

Dated:  January 20, 2015          JAMES F. McCABE
                                  MORRISON & FOERSTER LLP


                                  By: */s/ James F. McCabe*
                                  James F. McCabe

                                  Attorneys for Defendant
                                  LEXISNEXIS RISK SOLUTIONS INC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

     The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on January 20, 2015, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.2.  Any other counsel of record will be served by electronic mail.

Date:  January 20, 2015              _/s/ James F. McCabe_
                                  James F. McCabe

sf-3494404